IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| RHTC LIQUIDATING CO. | : | Case No. 09-11492-TPA |
| fka Railpower Hybrid Technologies Corp. | : | |
| fka Railpower Corporation | : | |
| fka Technologies Hybrides Railpower Corp. | : | Chapter 7 |
| *Alleged Debtor* | : | |
| | | |
| RHTC LIQUIDATING CO. | : | |
| f/k/a Railpower Hybrid | : | |
| Technologies Corp. | : | |
| *Movant* | : | |
| | : | |
| v. | : | Related to Document No. 20 |
| | : | |
| UNION PACIFIC RAILROAD | : | |
| COMPANY, THE FORQUER | : | |
| GROUP, STAUFFER DIESEL | : | |
| INC. AND EFCO, INC. | : | |
| d/b/a ERIE PRESS SYSTEMS | : | |
| *Respondents* | : | |

*Appearances:* Lawrence C. Bolla, Esq., for Petitioning Creditors
Dennis B. Auerbach, Esq., for Petitioning Creditors
Paul J. Cordaro, Esq., for Monitor
David W. Ross, Esq., for Alleged Debtor

## MEMORANDUM OPINION

The issue currently before the Court is whether this involuntary Chapter 7 case should

be dismissed because the Alleged Debtor, RHTC Liquidating Co., f/k/a Railpower Hybrid

Technologies Corp. (hereinafter usually referred to as "Railpower U.S.") is already involved in a

Canadian bankruptcy proceeding (discussed in more detail below) that has previously been given

Chapter 15 recognition in this Court.

1

The present case was commenced on August 14, 2009, when Union Pacific Railroad Company, The Forquer Group, Stauffer Diesel, and EFCO, Inc., d/b/a Erie Press Systems (collectively, the "Petitioning Creditors") filed an involuntary Chapter 7 petition against the Alleged Debtor.  The initial response to the involuntary petition was a ***Motion to Dismiss Involuntary Chapter 7 Case*** ("Motion") filed on September 8, 2009, at Document No. 20, pursuant to *11 U.S.C §305(a)* by the Alleged Debtor's "foreign representative", Ernst and Young, Inc., which had been appointed as the "Monitor" in the Canadian bankruptcy proceeding.[1]  The Alleged Debtor itself filed a "joinder" in the *Motion* that same date.

After the *Motion* was filed, the Court issued a Scheduling Order requiring a *Response* to the *Motion* by the Petitioning Creditors and briefs by the Parties.  On December 14, 2009, a status conference on the *Motion* was held and at that time the Parties advised the Court that there was a possibility of a negotiated resolution but, nevertheless, the Court should schedule a date for an evidentiary hearing, if needed.  On December 16, 2009, the Court entered an order setting forth a pretrial schedule and setting February 9, 2010 as the date for an evidentiary hearing.  Unfortunately, the Parties were not able to resolve the matter so it was necessary to go forward with the hearing.  However, through the good efforts of Counsel for the Parties, an agreement was reached on a set of stipulated facts necessary for decision on the *Motion*,  so that the February 9th "evidentiary hearing" ended up being only a legal argument.

---

[1]      The Court's jurisdiction to hear the *Motion* under *28 U.S.C. §§157* and *1334* is not in dispute.  This is a core matter pursuant to *28 U.S.C. §157(b)(2)(A), (O)* and *(P)*.

Having now reviewed all pertinent filings and considered the arguments of the Parties, the Court will deny the Monitor's *Motion*.

## FACTUAL BACKGROUND [2]

The Alleged Debtor, Railpower U.S., is an American company incorporated in the State of Washington.  It is a wholly-owned subsidiary of a Canadian company called 450-4020 Canada, Inc., formerly known as Railpower Technologies Corp. (hereinafter usually referred to as "Railpower Canada"). Together, Railpower U.S. and Railpower Canada are referred to herein as the "Railpower Entities."

Before the sale of most of their assets last year, the Railpower Entities were engaged in the production of efficient and ecologically-friendly railroad locomotives.  Railpower U.S. was formed to conduct these operations in the United States.  Its corporate headquarters is located in Quebec, Canada, in the same location as Railpower Canada.  However, at all relevant times most of the assets and employees of Railpower U.S. were located in the United States and it primarily operated from an office in Erie, Pennsylvania.  More than 90% in number of Railpower U.S. creditors are located in the United States and its customers were also primarily located in this country.

---

[2]     Unless otherwise stated, factual recitations in this *Memorandum Opinion* are taken from the Stipulated Facts contained in the *Consolidated Pretrial Narrative Statement/Stipulation* filed on behalf of the Monitor and the Petitioning Creditors, Document No. 65 at 13-20.

*Initiation of the Canadian Proceeding*

On February 4, 2009, a joint voluntary proceeding was commenced when Railpower U.S. and Railpower Canada filed a "petition" in the Québec Superior Court under the *Canadian Company's Creditors Arrangement Act*, or "CCAA", *R.S.C. 1985, c. C-36* [3]. This proceeding, which remains pending, will be referred to generally as the "Canadian Proceeding". On the petition date, the Canadian court entered an initial order in the Canadian Proceeding granting the petition of the Railpower Entities and providing for various other relief, including the appointment of Ernst & Young, Inc. as the Monitor for both Railpower Entities. The Canadian law firm of McCarthy Tetrault LLP represents both Railpower Entities in the Canadian Proceeding and the Railpower Entities presently have a single part-time employee who acts on behalf of both companies, and is paid on an hourly basis.

*The Initiation of the Chapter 15 Case*

On February 5, 2009, one day after the commencement of the Canadian Proceeding, the Monitor commenced a Chapter 15 case for Railpower U.S. in this Court by filing a petition under *Chapter 15* of the Bankruptcy Code, *11 U.S.C. §§1501-1532*, at Case No. 09-10198 ("the Chapter 15 case"). On that same day, the Monitor filed a motion seeking, *inter alia*, recognition of the Canadian Proceeding as Railpower U.S.'s "foreign main proceeding" (Chapter 15 case, Document No.3). On March 6, 2009, the Honorable Warren W. Bentz entered an Order in the

---

[3]    Canadian law apparently permits a joint filing in a single petition. In addition to the CCAA, Canadian law also includes the *Bankruptcy and Insolvency Act*, or "BIA", R.S.C. *1985, c. B-3*. The Court has been advised that the CCAA is a reorganization law somewhat comparable to Chapter 11 of the Bankruptcy Code while the BIA covers straight liquidations, similar to Chapter 7 of the Bankruptcy Code. *See also, http://www.ic.gc.ca/eic/site/cilp-pdci.nsf/eng/h_cl00021.html.*

Chapter 15 case granting the Monitor's motion and recognizing the Canadian Proceeding as

Railpower U.S.'s foreign main proceeding (Chapter 15 case, Document No. 23)[4]. That Order

provided in relevant part:

> ORDERED, that the Canadian Proceeding (including the initial order entered in the Canadian Proceeding) is granted recognition pursuant to section 1517(a) of the Bankruptcy Code; and it is further
>
> ORDERED, that the Canadian Proceeding is granted recognition as a foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code;
>
> ...
>
> ORDERED, that this court reserves the right under 11 U.S.C. §1521(b) to review any proposed distribution to creditors to determine "that the interests of the creditors in the united states are sufficiently protected" in view of the statement in debtor's motion that debtor owes trade payables of $825,000 and owes $66,900,000 to its parent corporation, raising questions as to the validity of the larger claim;

March 6, 2009 *Order*, Chapter 15 case, Document No. 3 at 3-4.

As the last paragraph quoted above demonstrates, Judge Bentz documented the

Court's concerns about the assertion that Railpower U.S. owed Railpower Canada approximately

$67 million ("the Intercompany Claim") as against the contention by the non-insider creditors ( for

the most part, the Petitioning Creditors) that this "claim" should actually be treated as a contribution

to equity.  This concern appears to have been the chief reason for Judge Bentz to include the

"reservation" language in the March 6, 2009 *Order*.

---

[4]     Judge Bentz retired on September 22, 2009, and responsibility for his cases was transferred to the Undersigned effective that date.

*The asset sale*, *the Canadian claims process and the Railpower U.S. estate*

On May 29, 2009, pursuant to an order of the Canadian court dated May 27, 2009 and this Court's *Order* dated May 28, 2009 (Chapter 15 case, Docket No. 67), the Railpower Entities sold substantially all of their assets to R.J. Corman Railroad Group, LLC (the "Asset Sale") and ceased their normal business operations. Substantially all of the Railpower U.S. assets that were sold to R.J. Corman were located in the United States.  This Court's May 28, 2009 *Order* approving the Asset Sale states in relevant part that

> ". . . the Monitor shall hold and segregate the proceeds generated from the sale of [Railpower U.S.'s] portion of the Acquired Assets in the Monitor's bank account in trust for the Debtor and its creditors and no distributions shall be made to the Debtor's pre-petition creditors until further authorized by this Court."

Chapter 15 case, Document No. 67, at 4.

On May 27, 2009, the Canadian court entered an order (the "Canadian Claims Process Order") that, *inter alia*, provides that: (i) a claims bar date by which creditors must submit proofs of claim, (ii) the Monitor is charged with the duty of reviewing all proofs of claim filed by creditors and, where applicable, sending the creditor a Notice of Revision or Disallowance to proofs of claim, (iii) the resolution of claims shall occur in accordance with the procedure set forth in the Canadian Claims Process Order, and (iv) all claim disputes and matters will occur and be resolved in the Canadian Court.

On June 2, 2009, the Monitor filed a motion in the Chapter 15 case seeking to have the Canadian Claims Process Order enforced in the United States.  Chapter 15 case, Document No. 69. On July 8, 2009, this Court entered an order granting that motion and recognizing and enforcing

in the United States the claims process established in the Canadian Claims Process Order, with certain modifications. See Chapter 15 case, Document No. 89. That order included the following provision:

> ORDERED that if the CCAA plan provides less than a 100% distribution to all creditors of [Railpower U.S.] other than for the potential claim of [Railpower Canada], then this Court reserves the right, either on its own initiative or upon objection of any claimant, to adjudicate the appropriateness of the allowance of Railpower Canada's claim against Railpower U.S. and to any distribution provided to Railpower Canada under the CCAA Plan.

The claims bar date by which creditors were required to submit proofs of claim against the Railpower Entities pursuant to the Canadian Claims Process Order was August 24, 2009.

Railpower US's current assets principally consist of approximately US $2 million of cash (as of January 20, 2010) held by the Monitor in trust in a Canadian bank account.[5] This cash was principally derived from (i) the Asset Sale, and (ii) the return to Railpower US of a US $419,000 security deposit that was held by Bank of America in the United States. Excluding the Intercompany Claim, approximately US $9.3 million in claims have been asserted against Railpower U.S. in accordance with the Canadian Claims Process Order. If the Intercompany Claim is included, approximately US $73.6 million in claims have been asserted against Railpower U.S. in accordance with the Canadian Claims Process Order.

---

[5] The Union Pacific Railroad Company has separately filed a *Motion...for an Order Directing Debtor's Funds to be Deposited into a United States Bank Account*, Document No. 57 in the Chapter 7 case and a similar motion in the Chapter 15 case at Document No. 127, seeking to have the funds being held in trust by the Monitor transferred to an account in a United States bank. The Court has scheduled argument on those motions for March 16, 2010.

The Monitor has advised the Court that it intends to issue a "notice of disallowance" of the Intercompany Claim on the grounds that it should be subordinated to the claims of non-insider creditors under principles of recharacterization and/or equitable subordination.  See Document No. 45.  The Monitor advised the Court in mid-November 2009 that it would be issuing this notice of disallowance "in the upcoming days" but it has apparently not done so as of yet.  This is of some significance because Railpower Canada will have ten (10) days to contest the disallowance, with that period beginning to run upon issuance of the notice.

For its part, Railpower Canada currently holds cash of approximately CN $3.9 million (as of January 20, 2010). That cash is also held by the Monitor in a Canadian bank account. The Monitor expects that Railpower Canada will receive an additional US $550,000 from a sale of locomotives, which the Monitor contends are owned by Railpower Canada.  Approximately CN $58.8 million in claims have been asserted against Railpower Canada in accordance with the Canadian Claims Process Order.  The Ontario Teachers Pension Plan ("OTPP") is Railpower Canada's largest shareholder (holding an interest of not less than 10%) and the primary secured creditor of Railpower Canada. OTPP is an investment fund based in Canada. OTPP has filed a claim of CN $41,560,000 against Railpower Canada in accordance with the Canadian Claims Process Order, all of which remains outstanding. OTPP asserts a lien on all of Railpower Canada's assets, with the exception of approximately CN $1 million in cash.[6]

---

[6]    The OTPP is currently seeking the right to intervene in both the Chapter 7 and Chapter 15 cases.  See Document No. 70 and Chapter 15 case Document No. 134. In these motions the OTPP asserts that effective February 1, 2010 it was "given the right to directly collect all payments due and owing to Railpower Canada, including those owed by Railpower U.S. on the Intercompany Claim", making it a creditor of Railpower U.S.  The Court has scheduled argument on these motions for March 16, 2010.

*The Involuntary Chapter 7 Case*

The Petitioning Creditors filed this involuntary Chapter 7 petition against Railpower U.S. on August 14, 2009. Canon Financial Services, Inc. joined as a Petitioning Creditor on September 9, 2009. The Petitioning Creditors represent more than 85 percent of the claims (in dollar amount and excluding the Intercompany Claim) that have been filed against Railpower U.S. The Intercompany Claim has not yet been disallowed. As such, if the Intercompany Claim is included in the claims filed against Railpower U.S., the Petitioning Creditors represent approximately 10 percent of the claims (in dollar amount) that have been filed against Railpower U.S. Union Pacific Railroad Company ("Union Pacific"), Railpower U.S.'s largest creditor (excluding the Intercompany Claim), has attended hearings and made representations to the Canadian Court in certain of the Canadian Proceedings. Union Pacific has timely filed a proof of claim against Railpower U.S. in the amount of US $7,838,312.50. The proof of claim was subsequently amended to $8,165,260.00.

An Order for Relief has not yet been entered in this Chapter 7 case. On September 8, 2009, the Monitor filed its *Motion* requesting dismissal of the Chapter 7 case.

## DISCUSSION

The *Motion* asks the Court to dismiss this case pursuant to the abstention doctrine recognized in *11 U.S.C. §305(a)*, which provides:

### § 305. Abstention

(a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—
    (1)  the interests of creditors and the debtor would be better served by such dismissal or suspension; or

9

(2)    (A) a petition under section 1515 for recognition of a
foreign proceeding has been granted; and

(B) the purposes of chapter 15 of this title would be best
served by such dismissal or suspension.

The Monitor as the party seeking relief under *Section 305(a)* bears the burden of proof on the

*Motion.  In re Mylotte, David & Fitzpatrick*, 2007 WL 3027352 *5 (Bankr. E.D. Pa. 2007).

Furthermore, the Monitor concedes that the decision whether to dismiss under *Section 305(a)* is

committed to the sound discretion of the Court based upon the totality of the circumstances.  *See*

*Brief of the Monitor in Support of Voluntary Dismissal of the Case*, Document No. 55 at 2 (citing

*In re O'Neil Village Pers. Care*, 88 B.R. 76, 79 (Bankr. W.D. Pa. 1988).

As is apparent from the language of the statute quoted above, there are two "tests"

for dismissal under *Section 305(a)* and they are written in the disjunctive, so that if either one is met

it will suffice for a dismissal.  The Monitor asserts that both tests are met, though it devotes most

of its attention to a dismissal under *Section 305(a)(2)*.  The Petitioning Creditors take the contrary

position, arguing that neither of the tests can be met, and that the *Motion* should therefore be denied

and the Chapter 7 case permitted to proceed.  The Court will consider each of the prongs under

*Section 305(a)* in turn.

*Dismissal Under Section 305(a)(1)*

Courts that have construed *Section 305(a)(1)* have generally agreed that abstention

under this provision is an extraordinary remedy that is appropriate only where the court finds that

<u>both</u> creditors and the debtor would be better served by a dismissal.  *See In re Globo Comunicacoes*

10

*e Participacoes S.A.*, 317 B.R. 235, 255 (S.D.N.Y. 2004) (citing cases).  The test under *Section 305(a)(1)* requires that both creditors and the debtor benefit from a dismissal, not merely the application of a balancing test to determine whether dismissal is appropriate. *Id*.  A dismissal pursuant to *Section 305(a)(1)* is to be granted only with "extreme caution."  *In re DGE Corp*., 2006 WL 4452846 *3 (Bankr. D. N.J. 2006). The Monitor, as the Movant, bears the burden of showing that the interests of the debtor and the creditors would benefit from dismissal.  *In re AMC Investors, LLC*, 406 B.R. 478, 488 (Bankr. D. Del. 2009).

After careful consideration of the filings and the arguments of the Parties, the Court concludes that the Monitor has not met its burden of proof under *Section 305(a)(1)*, and in particular, has not shown that a dismissal would benefit the creditors of Railpower U.S.  The Court notes that the Petitioning Creditors here represent approximately 85%, by number and amount, of the non-insider, unsecured creditors of Railpower U.S.  They also include large and sophisticated entities, for example the Union Pacific Railroad Company.

The Court starts with a presumption that these creditors have made a studied decision that their interests are best served by pursuing the involuntary Chapter 7 case in this Court rather than simply acquiescing in what happens in the Canadian Proceeding.  Furthermore, the Petitioning Creditors have expressed a number of reasons for this conclusion, including a fear that their interests are not being sufficiently protected in the Canadian Proceeding, differences between Canadian and United States bankruptcy law that are detrimental to them, the existence of insufficiently explained post-petition asset transfers from Railpower U.S. to Railpower Canada which have occurred during the pendency of the Canadian Proceeding, and, the failure of the Monitor to aggressively pursue

possible claims against Railpower Canada or insiders that could benefit the Railpower U.S. bankruptcy estate. The Petitioning Creditors contend that the continuance of the present case and the appointment of a Chapter 7 trustee is the best remedy for these problems.

The Monitor advances a number of arguments in an attempt to show that dismissal would actually be in the best interest of the creditors. It claims that distributions in the Canadian Proceeding are "on the horizon" and a Chapter 7 trustee will just add another layer of expenses to dilute the available assets. However, it appears almost certain that the OTPP is going to challenge the treatment of the Intercompany Claim in the Canadian Proceeding regardless of what happens in this Court, so any "imminent" distribution in Canada appears unlikely. Additionally, contrary to the Monitor's assertion, the appointment of a Chapter 7 trustee is not necessarily an expense-draining exercise, but rather in many instances, may be the most efficient way to proceed. If there are viable claims to be made against Railpower Canada or others, it certainly seems more likely that such claims will be pursued by a Chapter 7 trustee appointed by this Court rather than in the Canadian Proceeding.

The Monitor had also raised the specter that if this Chapter 7 case were not dismissed the OTPP would be likely to seek substantive consolidation of the Railpower Entity estates in the Canadian Proceeding or file a *Bankruptcy Insolvency Act* case against Railpower Canada, and possibly Railpower U.S., in Canada, which it predicted could be "catastrophic' for the Petitioning Creditors. *See* Monitor's *Brief* in support of *Motion* at 12, Document No. 55. Conversely, the Monitor predicted that if the Chapter 7 case were dismissed, OTPP would not take any further action against the Railpower Entities, would not contest the disallowance of the Intercompany Claim, and

would simply "close the file." *Id* at 15.  The Monitor's prediction in this regard has not proven to be accurate.

On February 12, 2010, only a few days after the hearing on the *Motion*, and with no decision having been yet made on it by this Court, OTPP filed a motion in the Canadian Proceeding by which it seeks relief from stay so that it can file *BIA* petitions against both of the Railpower Entities.  *See Petitioning Creditors' Supplemental Brief in Opposition to Monitor's Motion to Dismiss Involuntary Chapter 7 Petition*, Document No. 76.   In this motion, the OTPP makes clear that it believes Canadian law applies to the distribution of Railpower U.S. assets and the Intercompany Claim should be allowed. A hearing on OTPP's motion in the Canadian Proceeding has been set for March 17, 2010.

Although the Monitor had formerly contended that initiation of a *BIA* proceeding would be a catastrophe for the Petitioning Creditors, it now paints this latest  development in a more positive light, saying that permission to file *BIA* proceedings will result in the appointment of a trustee, which is exactly what the Petitioning Creditors are seeking in this Chapter 7 case.  Of course, such a trustee would be operating in the context of the Canadian law, under which the Petitioning Creditors contend their interests are not being adequately protected, especially regarding treatment of the Intercompany Claim.  Given the July 8, 2009 Order by Judge Bentz in the Chapter 15 case in which he reserved the right to adjudicate the treatment of the Intercompany Claim if non-insider creditors are not paid 100%, the Court does not share the Monitor's view that the appointment of a trustee under the *BIA* would benefit the Petitioning Creditors.

13

The Court therefore concludes that the Monitor has failed to meet its burden of proof as to dismissal of the case under *Section 305(a)(1)*.

*Dismissal Under Section 305(a)(2)*

A request for dismissal under *Section 305(a)(2)* is geared specifically to cases where there is also a pending Chapter 15 case involving the debtor. Chapter 15 was added to the *Bankruptcy Code* as part of the *Bankruptcy Abuse Prevention and Consumer Protection Act of 2005* ("BAPCPA"), *Pub.L. No. 109-8, 119 Stat.23*, so it is still fairly new, with little in the way of a developed case law.[7]

Chapter 15 largely incorporates the *Model Law on Cross-Border Insolvency* ("Model Law") promulgated by the *United Nations Commission on International Trade Law* ("UNCITRAL") in May 1997. *See* H.R. Rep. 109-31(I) at 105, reprinted at 2005 U.S.C.C.A.N. 88, 169. The Model Law and an accompanying Report and Guide published by UNCITRAL to accompany the Model Law are available at *http://www.uncitral.org/uncitral/en/commission/sessions/30th.html*. See also, A. Ranney-Marinelli, *Overview of Chapter 15 Ancillary and Other Cross-Border Cases*, 82 Am. Bankr. L. J. 269 (2008), for a helpful general discussion of Chapter 15.

There are two discrete elements to the test for dismissal set forth under *Section 305(a)(2)*. The first element is that a petition under *11 U.S.C. §1515* for recognition of a foreign proceeding has been granted. Both sides agree that this element has been met in the form of Judge

---

[7]    Prior to the enactment of Chapter 15 in *BAPCPA*, much the same function was served by former *11 U.S.C. §304* (repealed), entitled "Cases ancillary to foreign proceedings", albeit in a much less comprehensive manner.

Bentz's March 6, 2009 *Order*, Document No. 3, in the Chapter 15 Case.[8]  Therefore, attention is

centered on the second element, *i.e.*, whether the purposes of Chapter 15 would be best served by

a dismissal or suspension of this case.

Chapter 15 is unique among the various chapters in the Bankruptcy Code in that

Congress has actually spelled out the purposes behind the enactment of the Chapter in the statute

itself.  *11 U.S.C. §1501(a)* provides:

> Sec. 1501. *Purpose and scope of application*
>
> (a) The purpose of this chapter is to incorporate the Model Law on Cross-
> Border Insolvency so as to provide effective mechanisms for dealing with
> cases of cross-border insolvency with the objectives of -
>
> > (1) cooperation between -

---

[8]     At the argument on the *Motion,* Counsel for the Petitioning Creditors commented in passing that the Court has the power to revisit the recognition issue if it is shown that the grounds for granting recognition were fully or partially lacking or have ceased to exist.  *See 11 U.S.C. §1517(d).* The Court is aware of that power and does have some concerns about the propriety of continuing to recognize the Canadian Proceeding for Railpower U.S. as a "foreign <u>main</u> proceeding" (as opposed to a "foreign nonmain proceeding") in light of information that has come to light, or at least more into focus, since Judge Bentz issued his order. For instance, in recently filing their *Supplemental Brief in Opposition to Monitor's Motion to Dismiss Involuntary Chapter 7 Petition*, Document No. 76, the Petitioning Creditors included as an exhibit, an excerpt from the 2007 Annual Report of the Railpower Entities which states that Railpower U.S. "has its principal office in Erie, Pennsylvania".  This seems to conflict with the statement made to Judge Bentz at the hearing on May 5, 2009 that the "principal place of business [of Railpower U.S.] is in Brossard, Quebec."  Tr. at 6, Ch. 15 case Document No. 100.

It would seem to the Court that the undisputed facts that Railpower U.S. is an American corporation incorporated in the State of Washington, with a registered office address in Seattle, and with substantially all of its employees, assets, customers and business operations located in this country, do at least on their face raise an issue of whether the company's "center of main interests" should be considered as Canada, a necessary precondition for the Canadian Proceeding to be recognized here as a "foreign main proceeding."  *See 11 U.S.C. §§1502(4), (5), 1516(c)* (in absence of contrary evidence, debtor's registered office is presumed to be its center of main interests).  Unfortunately, Chapter 15 does not provide a definition for the key term "center of main interests".  The Court's limited research indicates that it was intended to be somewhat akin to the concept of "principal place of business," to use a term more familiar in American law, and that the foreign representative seeking recognition would have the burden of proof to show the foreign country is the debtor's center of main interests.  *See, e.g., In re Tri-Cont'l. Exchange, Ltd.*, 349 B.R. 627 (Bankr. E.D. Cal. 2006).  But, c.f., *Hertz Corp. v. Friend*, __ U.S. __, 2010 WL 605601 (February 23, 2010) (resolving a split among the Circuits and holding that "principal place of business" for federal diversity purposes under *28 U.S.C. §1332* is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities).

Ultimately, the Court does not believe that the question of whether the Canadian Proceeding should be properly characterized as a foreign main proceeding or a foreign nonmain proceeding is critical to a decision on the *Motion*, so it will not revisit that issue at this time.  However, the Court is aware of the issue and, depending on future events in the cases here or in Canada, could decide that another look is required.

15

(A) courts of the United States, United States trustees, trustees, examiners, debtors, and debtors in possession; and

(B) the courts and other competent authorities of foreign countries involved in cross-border insolvency cases;

(2) greater legal certainty for trade and investment;

(3) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor;

(4) protection and maximization of the value of the debtor's assets; and

(5) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

*11 U.S.C. §1501(a).* When a statute includes an explicitly-stated purpose it should be interpreted consistently therewith even if another canon of statutory construction might seem to point in a different direction. *Lopez v. ML #3, LLC*, 607 F. Supp.2d 1310, 1313 (N.D. Fla. 2009). The Court will therefore first separately consider whether a dismissal or suspension would best serve each of the stated purposes of Chapter 15 prior to reaching its overall conclusion.

(1) *Cooperation with the Canadian court*

The Parties have referred to this statutory purpose as the promotion of "comity" and the Court agrees that is an apt, shorthanded way of stating this element. However, the Parties disagree on whether a dismissal of the Chapter 7 case would advance the goal of comity.

The Monitor's argument is essentially that comity requires, or at least strongly suggests, that deference should be given to a foreign insolvency proceeding so long as that proceeding is governed by standards of fundamental fairness that allow the assets of a debtor to be

16

dispersed in an equitable, orderly, and systematic manner, even if the laws in that foreign proceeding

would result in a distribution to creditors that would be different than that provided by the

*Bankruptcy Code* under American law.  The Monitor has cited a number of cases, both pre- and

post-Chapter 15,  in which United States courts have deferred to foreign insolvency proceedings

(including specifically Canadian proceedings) in accordance with the principle of comity.  *See, e.g.,*

*Clarkson Co., Ltd., v. Shaheen*, 544 F.2d 624 (2nd. Cir. 1976), *Cornfeld v. Investors Overseas*

*Servs., Ltd.*, 471 F. Supp. 1255 (S.D.N.Y. 1979), *In re Ionica, PLC*, 241 B.R. 829 (Bankr.  S.D.N.Y.

1999), *In re Atala Shipping A/S*, 404 B.R. 726 (Bankr. S.D.N.Y. 2009), *In re Davis*, 191 B.R. 577

(Bankr. S.D.N.Y. 1996).

The Petitioning Creditors take a narrower view of comity, arguing that it respects the

interest of a foreign nation regarding application of its own laws to its own citizens.  In support of

this view, at the hearing on the *Motion,* Counsel for the Petitioning Creditors pointed out that all of

the cases cited by the Monitor in which a foreign insolvency proceeding was shown deference by

a United States court based on principles of comity involved foreign debtors, making those cases

distinguishable from the present case where the Alleged Debtor, Railpower U.S., is a United States

corporation.[9]

The Petitioning Creditors also rely on *Remington Rand Corporation-Del. v. Business*

*Sys. Inc.*, 830 F.2d 1260 (3rd. Cir. 1987) in which the court made a number of statements that would

-------------------------------------------

[9]        *See Transcript of Hearing,* February 9, 2010, at 53, Document No. 73.  Counsel for the Petitioning Creditors
continued to point out:

> "There is not a single case that the Monitor cited where a U.S. Court granted comity to
> adjudicate a bankruptcy case of a U.S. company in a foreign jurisdiction.  He didn't find it,
> I didn't find it.  So this is a different animal, Your Honor."

Counsel for the Monitor had an opportunity to rebut that contention but did not do so.

seem to comport more closely with their view of comity than with that of the Monitor. For instance, the *Remington* court stated:

> In the foreign bankruptcy context, comity is based on the additional rationales that the foreign debtor's assets will be distributed in an equitable fashion..., and that one who conducts his affairs with foreign corporations subjects himself to foreign bankruptcy laws.

830 F.2d at 1267-68 (citations omitted).  Later in its opinion the *Remington* court stated:

> American courts have recognized the interest of foreign courts in liquidating or winding up the affairs of their own domestic business entities. Creditors of an insolvent foreign corporation may be required to assert their claims against a foreign bankrupt before a duly convened foreign bankruptcy tribunal.

830 F.2d at 1271.

Finally, the Petitioning Creditors argue that no special deference is due in the present case, where the Canadian court would be applying Canadian law in an insolvency regarding a United States company wherein the funds to be distributed were derived primarily from the sale of assets that were located in this country.

The Court finds that the Petitioning Creditors' have presented a compelling argument on this point.  It is not readily apparent why a court in the United States should voluntarily restrain itself from acting purely out of a sense of comity in these circumstances.

The  Monitor responds by quoting from a venerable opinion of the Supreme Court in which that Court stated that comity "is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international

duty and convenience, and to the rights of its own citizens, *or of other persons who are under the protection of its laws*." *Hilton v. Guyot,* 159 U.S. 113, 164 (1895) (emphasis added). The Monitor appears to read the emphasized language as saying that comity is due here because Railpower U.S. is a "person" under the protection of the laws of Canada, even though it is not a citizen of that country. The Court disagrees with that reading of the language in *Hilton*. It seems more plausible that the term "its laws" in the quotation from the case is actually a reference to the laws of the court in which the question of comity is under consideration, not the foreign court.

The Monitor also fails to give sufficient acknowledgment to the fact that comity is not just a one-way street. Just as this Court will defer to a foreign court if the circumstances require it, so too should a foreign court defer to this Court when appropriate. In this case it was clear from the start that Judge Bentz expressed reservations about the distribution of Railpower U.S. assets in the Canadian Proceeding which is why every key order he entered in the Chapter 15 case included a provision to the effect that Railpower U.S. assets were not to be distributed in the Canadian Proceeding without the prior approval of this Court. The Monitor has non explained how this requirement is to be met unless the Canadian court shows comity to this Court.

The Monitor is on firmer ground in pointing out that this Court previously recognized the Canadian Proceeding as a "foreign main proceeding" without objection by the Petitioning Creditors. This is arguably some evidence of a tacit acceptance by the Petitioning Creditors to the contention of the Monitor that the "center of main interest" of Railpower U.S. is in Canada, which of course tends to undercut their argument that no deference should be paid to the Canadian Proceeding under the comity principle because Railpower U.S. is a United states company, with its

19

assets in this country, etc.  As indicated above (see n. 8 *supra)*, the Court does have some question as to whether that recognition should continue.[10]

To sum up, the Court finds that application of the underlying law on the principle of comity as considered without regard to the events occurring in the Chapter 15 case, lead to a finding against deferral to the Canadian Proceeding, and thus a finding against dismissal of the Chapter 7 case.  The previous recognition by this Court of the Canadian Proceeding as a foreign main proceeding in the Chapter 15 case is a factor that goes the other way, though it is not enough to completely overcome the initial conclusion based on the law of comity.  Thus, although the facts of the case do not support an absolutely clear conclusion on the point, the Court finds that, on balance, the purpose of comity, or cooperation underlying Chapter 15, is not likely to be advanced by a dismissal of the Chapter 7 case.

### (2)  Legal certainty for trade and Investment

The Parties disagree with respect to this factor as well.  The Monitor sets forth the view that  a dismissal of the Chapter 7 case would benefit this purpose because if the case is permitted to proceed "parties will likely become uncertain and confused as to which insolvency proceeding they must comply."  The Petitioning Creditors respond by arguing that creditors and other parties who dealt with Railpower U.S. would reasonably expect that a liquidation of the

---

[10]    Nevertheless, unless and until such time as the recognition is withdrawn by the Court, its existence is a factor that weighs in favor of the Monitor's position that dismissal is appropriate to further the Chapter 15 purpose of comity.

company would occur in this country because  it is an American corporation and most of its operations, assets, and customers  were here.  Both sides make valid points on this issue, but once again, it appears that the Petitioning Creditors have the stronger argument.

It does seem reasonable to conclude that creditors or investors dealing with a company from a particular country, and with most of its assets and operations in that same country, would anticipate a liquidation of the company would also occur there.  That is not to say that such a liquidation can never occur in a different country, merely that the normal expectation (existing at the time the decision is made to transact business with the company) is that it would not.  A refusal to dismiss the present case would thus further the purpose of providing some legal certainty, both in this case and for the guidance of parties in the future,  by respecting this normal expectation.  On the other hand, if the case were dismissed it would be in response to the particular facts presented, and would offer little or no guidance for parties in future cases.

### (3)  Fair and efficient administration/ protection of interests

Along with the "cooperation" factor, this one is perhaps the most significant to the Court's determination.  The Petitioning Creditors argue strenuously that their interests are not being adequately protected in the Canadian Proceeding and that it is necessary to allow the present case to proceed so that a trustee can be appointed.  They cite a number of specific ways in which they contend this alleged lack of protection has been manifested, including that:

> • An irreconcilable conflict of interest exists between Railpower U.S. and Railpower Canada yet the same single employee gives instructions to counsel on behalf of both entities in the Canadian Proceeding.

21

- A net of at least CN $700,000 has been transferred *after* the petition date from Railpower U.S. to Railpower Canada, something which Petitioning Creditors contend is a violation of this Court's March 6, 2009 Order in the Chapter 15 case, Document No. 23.[11]

- The Monitor has not done anything in the Canadian Proceeding to attempt to recover these post-petition payments or to assert other potential claims against Railpower Canada or insiders.

- Even though the Monitor has indicated it will seek disallowance of the Intercompany Claim that Railpower Canada has asserted against Railpower U.S., Railpower Canada can contest such disallowance and the status of the doctrines of recharacterization of debt as equity and equitable subordination in the Canadian Proceeding is uncertain.

- The Intercompany Claim, if allowed, will result in approximately 90% of Railpower U.S.'s assets going to Railpower Canada, and ultimately to its largest shareholder OTPP, whereas Railpower U.S.'s other creditors will receive less than a 2% dividend.

- The OTTP has recently filed documents in the Canadian Proceeding indicating it is seeking relief from stay so it can file *Bankruptcy and Insolvency Act* proceedings against the two Railpower Entities.

The Petitioning Creditors have raised valid concerns about whether their interests are being sufficiently protected in the Canadian Proceeding which have not been addressed by the Monitor to the Court's satisfaction.

It was clear from the outset of the Chapter 15 case that this Court had some concerns about the protection of the non-insider creditors of Railpower U.S. in light of the large Intercompany

---

[11]    At the hearing on the *Motion*, Counsel for the Petitioning Creditors also raised an issue about another post-petition transfer of $127,000 from Railpower U.S. to Railpower Canada for payment of professional fees of which he recently became aware. He questioned whether such payment was in violation of the March 6, 2009 or May 28, 2009 Orders in the Chapter 15 Case. Counsel for the Monitor explained that this transfer occurred as a "reimbursement" because Railpower U.S.'s bankruptcy-related legal expenses had inadvertently been paid out of Railpower Canada funds. Counsel for the Monitor stated that he had advised Judge Bentz of the possibility that administrative claims could be paid out of the proceeds from the sale of assets and it was understood this such would not require prior approval of this Court. The transcript of the May 28, 2009 sale motion hearing confirms that to be an accurate characterization of the hearing. See Tr., Document No. 135 in the Chapter 15 Case at 18-20. As such, this transfer cannot be considered a violation of the Orders, although it would have been preferable for the Monitor to have advised this Court of the transfer out of courtesy, if nothing else.

Claim  and the possibility of a substantive consolidation of the estates of the Railpower Entities in

the Canadian Proceeding.  That was the reason for the reservation of the right under *11 U.S.C.*

*§1521(b)* retained in the March 6, 2009 *Order* for this Court to review any proposed distribution to

creditors to insure that the interests of the creditors in the United States were sufficiently protected.

Chapter 15 case, Document No.  23 at 4.  That concern was again noted at the hearing on the motion

to approve the sale of Railpower U.S. assets, with Counsel for the Monitor stating that a provision

had been put in the proposed sale order preventing any distributions to unsecured creditors until

further order of this Court  "because of some of the concerns that you [i.e., Judge Bentz] raised

earlier in the case."  *Tr. of 5/28/2009 hearing at 19*,  Chapter 15 case  Document No. 135.

 The Court's misgivings as to the fairness of the Canadian Proceeding *vis-a-vis* the

creditors of Railpower U.S. have been heightened by the recent revelation and acknowledgment by

the Monitor of the large net post-petition transfer from Railpower U.S. to Railpower Canada.  While

the Court is not prepared at this time to firmly conclude that the transfer was done in violation of

the Orders in the Chapter 15 case, the Petitioning Creditors' argument to that effect is certainly not

frivolous.  Since the Monitor is by its own admission a "neutral" party in the Canadian Proceeding,

the Court is left to wonder who is left to advocate for the interests of the creditors as against

Railpower Canada and the OTPP.

 As a counterpoint against these reasons for concern about the fairness to creditors,

the Monitor had until recently been able to point to a perceived significant advantage in time and

efficiency to be gained by deferring to the Canadian Proceeding.  However, recent events have

called even that into substantial doubt.  First, the Court was informed at the recent hearing that the

23

notice of disallowance of the Intercompany Claim has not yet been issued in the Canadian Proceeding. It appears virtually certain that Railpower Canada and/or the OTPP will challenge that disallowance, thereby indefinitely delaying any possible distribution to creditors. Second, as indicated previously, contrary to the prediction by the Monitor that the OTPP would not attempt to file *BIA* petitions against the Railpower Entities so long as the present Chapter 7 case were dismissed, the OTPP in fact took that step on February 12, 2010, three days after the hearing on the *Motion*. Any suggestion that the creditors would enjoy a quick distribution if only this Court agrees to defer to the Canadian Proceeding by dismissing the present action is thus untenable.

In light of the foregoing, the Court concludes that the Monitor has failed in its burden of showing that a dismissal of the present case would advance the important interest of protection of the Petitioning Creditors. In fact, to the contrary, it appears to the Court that a dismissal would actually have the opposite effect.

### (4) *Protection and maximization of debtor assets*

The Monitor argues that a denial of the *Motion* will create a new and unnecessary layer of Chapter 7 administrative fees, including trustees' fees, attorneys' fees and other expenses, that will only serve to dilute the funds available for distribution to creditors. Petitioning Creditors counter that the appointment of a Chapter 7 trustee would have offsetting savings because the Monitor and its Canadian and U.S. counsel and the Railpower Entities' Canadian counsel will no longer be charging fees to the Railpower U.S. estate. They additionally note that Chapter 7 professional fees are subject to review and approval by the Court, something which is apparently not true under Canadian insolvency law.

24

At the hearing on the *Motion* the Court advised the Parties that, based on its personal experience, it gives little credence to the contention that a Chapter 7 proceeding will necessarily add costs, thereby reducing the assets of Railpower U.S. that are available for distribution to creditors. Although it is impossible to predict with certainty in advance which would be the least costly alternative,  the Court believes it is at least equally likely that allowing this case to proceed will result in streamlining efficiencies that will benefit the estate.

*(5)   Rescue of financially troubled businesses*

This factor is of no relevance under the circumstances of the *Motion* because the assets of Railpower U.S. have already been liquidated and the company is no longer engaged in business operations.  A decision either to dismiss the case or allow it to proceed will have no impact on rescuing the business or protecting investment or employment.

**CONCLUSION**

For the reasons stated above, the Court finds that the Monitor has failed to meet its burden of proof under either prong of *Section 305(a)* and accordingly, its *Motion* will be denied. The Court wishes to stress that its decision should in no way be read as a criticism of the Canadian Proceeding or Canadian insolvency law in general.  The Court merely finds that under the specific facts of this case, and in light of the current procedural posture of the Canadian Proceeding, dismissal of this case involving an American debtor whose assets and creditors were primarily in this country, and with this Court's prior reservations placed on the record directed at protecting the dividend ultimately paid to the Petitioning Creditors, is not warranted.

25

The recognition of a foreign proceeding in a Chapter 15 case was never intended to be an automatic bar to additional proceedings being brought in the United States that might, to some extent, conflict with or overlap the foreign proceeding. This should be apparent from the fact that a request for dismissal under *Section 305(a)(2)* is subject to the discretion of the bankruptcy court after weighing the purposes of Chapter 15. See also, *UNCITRAL Guide to the Model Law at 9* ("[r]ecognition of foreign proceedings does not prevent local creditors from initiating or maintaining collective insolvency proceedings in the enacting state.").

The Court further recognizes that the Canadian Proceeding is ongoing, and future developments occurring there could conceivably change the analysis under *Section 305(a)*. The denial of the *Motion* will therefore be without prejudice to refiling and renewing a request for relief in the event of any material change in circumstances.

Finally, although the Alleged Debtor would normally have 14 days to file an *Answer* to the Involuntary Petition following denial of a motion to dismiss, see *Fed.R.Bankr.P. 1011(c), 7012(a)*, the Court does not believe that much time is necessary in the circumstances presented. The case has already received extensive attention by the Parties and the Court, and, if an *Answer* is to be filed contesting the Involuntary Petition containing allegations not already addressed in the *Motion*, it should be fairly easy to prepare and not burdensome to file in the reduced time period. Accordingly, the Court will shorten the time for filing an *Answer* to one week.

An appropriate *Order* will follow.

Dated: March 5, 2010

Thomas P. Agresti, Chief Judge
United States Bankruptcy Court

Case Administrator to serve:
    Paul J. Cordaro, Esq.
    David W. Ross, Esq.
    Mark A. Lindsay, Esq.

Joseph F. Gula, III, Esq.
Lawrence C. Bolla, Esq.
Robert W. Pontz, Esq.
James M. Greenfield, Esq.